## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

  vs.                                                     No. 14-CR-3604-MV

FIRAS ABU ZUHRIEH, *et al.*,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Firas Abu Zuhrieh's Motion for

Suppression of Statement and Evidence [Doc. 23].  The government responded [Doc. 27], but

Defendant did not reply.  The Court held a hearing on the Motion on May 5, 2015 [Doc. 58]; at

the conclusion of the parties' evidentiary presentations, the Court asked that they submit written

closing arguments.  *See* Docs. 59-60.  The Court, having considered the Motion, briefs, relevant

law, hearing transcript, and being otherwise fully-informed, finds that the Motion is not well-

taken and therefore will be **DENIED.**

## BACKGROUND

The general contours of this case are not significantly disputed.  On September 22, 2014,

agents with the United States Drug Enforcement Administration ("DEA") executed a search

warrant at Defendant Abu Zuhrieh's business, the "Ace Smoke Shop" and his residence.  Doc.

58 at 20-21.  When law enforcement officials "arrived at the smoke shop," Abu Zuhrieh was

outside of the building, "smoking a cigarette" while his employee and co-Defendant, Islam

Kandil, remained "inside of the shop." *Id.* at 21.  Abu Zuhrieh "was taken into custody" and "handcuffed by a task force officer" immediately upon the officers' arrival. *Id.* at 22.

"After the scene was kind of settled down," Special Agent Jeffrey McKinley of the DEA and his "intelligence analyst, Roxanne Chavez," led the Defendant "outside the back of his shop, and spoke with him." *Id.*  The smoke shop occupies "a suite within a strip mall" such that behind the businesses there is a common alleyway; here, McKinley and Chavez were able to speak to Abu Zuhrieh while affording their conversation relative privacy from Islam Kandil and the agents in the store. *Id.* at 23-24.  At this point, McKinley and Chavez were the only government officials in the vicinity. *Id.* at 24-25.  On the date in question, McKinley carried a service weapon, but it remained concealed during his conversation with Abu Zuhrieh and McKinley doubts that Defendant could have seen it. *Id.* at 25. *See also id.* at 68-69.

Here, the accounts diverge slightly, but are easily reconciled.  Abu Zuhrieh testified that he was "very scared … because a lot of people were there and they had – they were armed" and "dressed in civilian clothes." *Id.* at 102.  However, it is not clear from the testimony whether the "there" to which Abu Zuhrieh refers is the alleyway behind the building or the general vicinity of the smoke shop.  Given the context, the Court finds that McKinley, Chavez, and Abu Zuhrieh were the only three people in the alley during the initial questioning.  Similarly, while Abu Zuhrieh testified that he saw various people "dressed in civilian clothes" carrying "rifles," he did not claim that McKinley brandished a weapon or that anyone with a gun participated in his interrogation. *See, e.g.*, *id.* at 102.  Consequently, the Court understands Abu Zuhrieh's testimony to refer to the presence of other armed officers in the smoke shop and its environs, rather than in his immediate presence.

Before McKinley and Chavez began to question Abu Zuhrieh, McKinley explained to the Defendant that "you have to understand your rights" and faithfully recited the *Miranda* warnings, to which he added the clarifications that "[i]f you decide to start answering questions now without an attorney present, you have the right to stop answering at any time, and you also have the right to stop answering at any time until you talk to your attorney." *Id.* at 26. McKinley followed up on this formal issuance of rights with an informal confirmation that Defendant had understood McKinley, employing a routine quip about his *Miranda* speech sounding "a lot like Law & Order," apparently in an effort to ground the potentially arid discussion of procedural rights in something more accessible to Abu Zuhrieh. *Id.* at 28.

While Abu Zuhrieh argues that his limited comprehension of spoken English inhibited his ability to understand, he admits that he does not recall whether McKinley advised him of his *Miranda* rights, adding that if he had not understood McKinley's admonitions at the time he would not have asked the agent to repeat himself or rephrase his statements because Abu Zuhrieh "was afraid of him." *Id.* at 102-03. McKinley, however, states that Abu Zuhrieh "seemed to understand" the warnings, explaining that while Defendant is "from Jerusalem" and speaks with a "heavy" Arabic-inflected accent, McKinley could understand Abu Zuhrieh's spoken English and had no concerns that Defendant "understood the admonitions" that he had been given. *Id.* at 27-28. McKinley elaborated on this explanation, detailing his experience with Hispanophone suspects, noting that he "wouldn't just ruin" a "federal investigation" by continuing to question someone whom he was not sure had appreciated or understood what he had said. *Id.* at 28. McKinley's evaluation of Abu Zuhrieh's proficiency in English was corroborated by the fact that Defendant responded appropriately to the questions McKinley posed, not merely in the

affirmative or the negative, but also with narrative responses that required him to express himself in English. *Id.* at 36.  Further, in the instant case, earlier portions of the investigation, including a "controlled buy" of spice had occurred entirely in English, such that it appeared to McKinley that Abu Zuhrieh routinely conducted business in English. *Id.* at 29.  At no point did Abu Zuhrieh request that Agent McKinley repeat himself, clarify his phrasing, or explain the meaning or significance of any term he used.

Irrespective of whether McKinley issued the appropriate warnings, Abu Zuhrieh insists that he did not understand the content of his rights. *See* Doc. 103-04.  Instead, he suggests that he responded to McKinley's inquiries because he had been intimidated by the "way he came to my store, he broke the door to the bathroom, and he started talking to me about extremism and terrorism." *Id.* at 104.  However, the Court credits McKinley's testimony that neither he nor anyone else actively discussed Islamic terrorist organizations[1] until they "were gone from the smoke shop," at which point an FBI agent did question Abu Zuhrieh about extremism in the Middle East. *Id.* at 50-52.

Whether or not Defendant understood the significance of the waiver he had rendered, Abu Zuhrieh began answering McKinley's questions, including a description of the means by which he acquired the Bizarro and Scooby Snax branded spice products. *Id.* at 30-33.  Shortly thereafter, Supervisory Special Agent Eduardo Chavez approached Abu Zuhrieh regarding "Suite H" in the same strip mall; evidently, the owner of the complex had approached Chavez and, during their conversation, indicated that Defendant had rented a second unit and possessed

---

[1]     Without delving into the controversy surrounding the appropriate nomenclature for the organization variously termed the Islamic State of Iraq and Syria, the Islamic State of Iraq and the Levant, and Da'ish, in the interest of uniformity and simplicity, the Court will refer to the militant jihadis as ISIS.

the only corresponding key.  *Id.* at 81-82.  Chavez asked Defendant to confirm this information;

Defendant "nodded affirmatively and said yes," indicating that he had "leased another suite in

the strip mall" and that it was "Suite H."  *Id.* at 83.  Chavez then asked Defendant "if he had a

key for Suite H;" in response, Abu Zuhrieh "stood up and reached into his little coin pockets that

the Levi jeans have, and it took him a while because of his handcuffs, and fished out a key from

there" which he handed to the agent.  *Id.* at 83-84.  Chavez then asked if the agents could search

the suite and Abu Zuhrieh "responded that [they] could search."  *Id.* at 84.  Upon entering Suite

H, the officers found "well over 100 pounds" of spice in "garbage bags and boxes."  *Id.* at 85.

        "[W]ithin a matter of weeks" after the search of his store and Suite H, Abu Zuhrieh

voluntarily appeared at the Albuquerque DEA office and requested an audience with McKinley,

asking if they were "going to do this or what?"  *Id.* at 37.  McKinley appropriately declined

Defendant's offer of cooperation, explaining that any such discussion would have to proceed

through Abu Zuhrieh's attorney.  *Id.*  For the purposes of this motion, however, the relevant

information gleaned from this episode is that when Defendant sought, on his own initiative, to

enter into sensitive and legally significant negotiations with the government, he felt sufficiently

confident in his capacity to comprehend English to venture to the DEA office alone, without an

interpreter or even his attorney.

**DISCUSSION**

I.    **Waiver of *Miranda* Rights**

        "Under Miranda, law enforcement officers must advise a suspect who is subjected to

custodial interrogation that he has the right to remain silent, that statements can be used against

him, that he has the right to counsel, and that he has the right to have counsel appointed."  *United*

5

*States v. McCluskey*, 893 F. Supp. 2d 1117, 1138 (D.N.M. 2012). *See also Missouri v. Seibert*, 542 U.S. 600, 608 (2004) ("failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained."). Any "waiver of one's Fifth Amendment privilege against self-incrimination must be made voluntarily, knowingly and intelligently." *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008) (internal quotation marks omitted). "Whether this standard is met depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.* The government bears the burden of proving an effective waiver by a preponderance of the evidence. *See United States v. Morris*, 287 F.3d 985, 988 (10th Cir. 2002).

However, an "express statement of waiver is not required; the waiver can be inferred from the defendant's actions and words." *United States v. Christy*, 785 F. Supp. 2d 1004, 1027 (D.N.M. 2011). Even so, for a waiver to be valid, the Court must satisfy itself that it was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burson*, 531 F.3d at 1257. The Tenth Circuit has emphasized two features of this analysis:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Morris*, 287 F.3d at 988. While *Miranda* warning must be rendered in a language that the suspect understands, "imperfect" translations are sufficient, so long as he is apprised of the

"substance or essence of his *Miranda* rights."   *United States v. Bustillos-Muñoz*, 235 F.3d 505, 516-17 (10th Cir. 2000).  Based on this analysis, the Court is compelled to find that Abu Zuhrieh effectively waived his *Miranda* rights and that, therefore, his statements will cannot be suppressed as violative of his Fifth Amendment rights.

    a.   *Defendant's waiver was not coerced.*

There is no evidence in this case of "intimidation, coercion, or deception."  It appears that the DEA agents acted politely, did not use abusive language or threaten Defendant in any way. While Abu Zuhrieh argues that he was frightened by the search of his store and discussions of Islamic extremism, the Court is not persuaded that Defendant consented as a result of intimidation.  Abu Zuhrieh conceded that McKinely spoke to him "very diplomatically, and he saw that I was nervous and he offered me a cigarette."  Doc. 58 at 114.  Further, the Court finds that at this point McKinley mentioned the Middle East only in passing and solely by way of establishing a rapport with Abu Zuhrieh, who had lived in Jerusalem; any earnest discussion of Islamic extremism did not occur until Defendant met with an agent from the Federal Bureau of Investigation at the Albuquerque DEA office.  Similarly, at the time of his waiver, the sole government agents present were Chavez and McKinley, neither of whom visibly bore weapons; Abu Zuhrieh had been escorted outside, beyond the view of any obviously armed agents "[a]fter the scene was kind of settled down," which works to dissipate some of the pressure inherent in a police raid.  *Id.* at 22.  That is, other than the initial shock associated of arrest and some possible concern induced by mentioning the Middle East, Abu Zuhrieh was not subject to any threat or coercion that would influence his decision to waive his *Miranda* rights.  *See, e.g.*, *United States v. Varela*, 576 F. App'x 771, 779 (10th Cir. 2014) (noting that agents "did not raise their voices,

make any threats, or act in any way that was intimidating" and that they, like McKinley, "were polite and friendly"); *United States v. McCluskey*, 893 F. Supp. 2d 1117, 1135 (D.N.M. 2012) (relying on the fact that the officers "dressed in plain clothes, did not display their weapons, spoke respectfully to McCluskey, and did not use force or threaten to use force against him."). Under these circumstances, the Court holds that any *Miranda* waiver was voluntary, rather than extracted by threat or intimidation.

      b.  *Defendant's waiver was knowing and intelligent.*

Defendant knowingly waived his privilege against self-incrimination.  Defendant argues that because of his limited comprehension of English and his unfamiliarity with the Anglo-American legal tradition he was unable appreciate the consequences of the decision he was asked to make.  The Court disagrees.  Stated succinctly, the Court does not believe that Abu Zuhrieh did not understand or appreciate the *Miranda* warnings as rendered by McKinley.  First, Abu Zuhrieh has lived and conducted business in the United States for more than a decade.  The Court appreciates that Defendant may not have attained complete fluency, but given that he managed to operate a business with a predominately English-speaking clientele and manage his financial affairs, the Court finds incredible the suggestion that he did not comprehend the plain, language of *Miranda*.  *See United States v. Garcia-Escalera*, 998 F. Supp. 2d 1191, 1203 (N.D. Okla. 2014) (explaining that Defendant "conducted drug transactions with [co-defendant] even though she could not speak Spanish, and [co-defendant's] testimony shows that defendant was comfortable conversing in English, even though it was not his primary language").

Second, Defendant appropriately answered the agents' questions, including a description of "where he got the Bizarro and Scooby Snax that he had,"  which indicates to the Court that,

8

despite whatever anxiety he might have felt, he was not so bereft of his linguistic faculties as to not understand the agents' inquiries. *Id.* at 64. Indeed, throughout the entire search, he "interact[ed] appropriately with" individuals speaking to him in English, further underscoring that he comprehended his interaction with the law enforcement officers at the scene. *Id.* at 91. *See also Garcia-Escalera*, 998 F. Supp. 2d at 1203 ("In addition, the evidence shows that [defendant's] statements to [the officer] were made in response to questions by [the officer], and this shows that he understood the questions and made appropriate, even if misleading, responses."); *United States v. Sanchez-Chaparro*, 392 F. App'x 639, 644 (10th Cir. 2010) (upholding a finding that defendant sufficiently understood his *Miranda* warnings and considering various factors, including that defendant "generally responded appropriately to [the officer's] questioning during the traffic stop").

Third, Defendant voluntarily appeared alone at the DEA office on at least one occasion in a misguided effort to strike a cooperation agreement directly with McKinely; this effort indicates to the Court that, faced with a potentially life-altering conversation, Abu Zuhrieh felt sufficiently confident in his facility with spoken English to present himself to the DEA without an attorney or even an interpreter. If it were true that Defendant is uncomfortable with the American legal system and spoken English, surely he would have not endeavored to initiate such complex negotiations without the attorney that he had already been provided. Finally, during the hearing held on this Motion, Defendant on several occasions responded in English to questions posed by the Prosecution, circumventing his interpreter and demonstrating that he is, evidently, *more* comfortable in English than Arabic. These facts readily put lie to the notion that Defendant did not understand the irreducibly simple phrase, "you have the right to an attorney."

The testimony of Defense Investigator, Eric Hansen, is not to the contrary.  Even if the Defense team faced some difficulty in explaining "legal processes" to Abu Zuhrieh, this argument misses the mark.  *Id.* at 95.  There is no requirement that a suspect attain a mastery of constitutional law or criminal procedure prior to waiving his rights and Defendant has offered no legal support for this element of his argument.  To the contrary, the animating purpose of the demand that police inform suspects of their rights prior to questioning them is to apprise potential defendants of the rights relevant in the circumstances; the only legal knowledge required is, by design, transmitted by the warnings themselves.  *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 468 (1966) ("For those unaware of the privilege, the warning is needed simply to make them aware of it—the threshold requirement for an intelligent decision as to its exercise.").

## II.    Consent to Search Suite H

It is by now black-letter law that "[c]onsent is an exception to the Fourth Amendment's warrant requirement for a search."  *United States v. Romero*, 749 F.3d 900, 905 (10th Cir. 2014).  *See also Schneckloth v. Bustamante*, 412 U.S. 218, 222 (1973) ("a search authorized by consent is wholly valid.").  Thus, "[w]hen an individual consents to a police search, and the consent is 'freely and voluntarily given,' the search does not implicate the Fourth Amendment."  *Reid v. Paulter*, 36 F. Supp. 3d 1067, 1161 (D.N.M. 2014) (Browning, J.).  The Tenth Circuit has explained that "voluntariness" is determined "under the totality of the circumstances" and that courts should employ "a two-part test to guide [their] inquiry."  *United States v. Sanchez*, 608 F.3d 685, 690 (10th Cir. 2010).  This test requires that the prosecution:  "(1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given, and (2) the officers must have used no implied or express duress or coercion."  *Id*. (internal

quotation marks omitted).  Factors that courts in this circuit have endorsed as relevant to the

"totality of the circumstances" analysis include:

> (i) the threatening presence of several officers; (ii) the use of aggressive language or tone
> of voice indicating that compliance with an officer's request is compulsory, or,
> conversely, the officer's pleasant manner and [ ] tone of voice; (iii) the prolonged
> retention of a person's personal effects such as identification, or, conversely, the prompt
> return of the defendant's identification and papers; (iv) the absence of other members of
> the public, or, conversely, whether the stop occurs in a public location such as the
> shoulder of an interstate highway, in public view; (v) the officer's failure to advise the
> defendant that [he or] she is free to leave.

*United States v. Sedillo*, No. CR 08–1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010)

(Browning, J) (some alterations in original).  Additionally, an individual's difficulty

understanding the request for consent should be considered.  *See, e.g.*, *United States v.*

*Hernandez*, 893 F. Supp. 952, 961 (D. Kan. 1995) ("Language barriers are relevant in evaluating

the suspect's ability to act knowingly, intelligently, and voluntarily.").  Of course, no one factor

is dispositive and the Court must assess the situation that confronted the Defendant at the time he

rendered his consent.  Moreover, while consent must be unequivocal and specific, it need not be

verbal and "may instead be granted through gestures or other indications of acquiescence, so

long as they are sufficiently comprehensible to a reasonable officer."  *United States v. Guerrero*,

472 F.3d 784, 789-90 (10th Cir. 2007).

Here, the government has adequately demonstrated that Abu Zuhrieh freely consented to

the search of Suite H.  First, the Court credits Chavez's testimony that Abu Zuhrieh

unequivocally consented to a search of the suite after volunteering the key corresponding to that

unit.  *See* Doc. 58 at 84.  Second, although there are genuine constitutional issues posed by

rendering requests in a language that the interlocutor cannot appropriately comprehend, as the

Court discussed above, Defendant is sufficiently capable in English to comprehend the meaning

11

of direct, unambiguous phrases such as "Do you mind if we take a look in there for anything that would be illegal?" *Id.* at 84.

Moreover, there is no genuine suggestion of coercion in the instant case. While it does not appear that the DEA agents explained to Abu Zuhrieh that he was free to refuse to the search, he had already been issued his *Miranda* warnings, which works to allay this concern, as he had already been apprised of his right to consult with an attorney. Further, at the time Defendant agreed to the search, it appears that there were, at most, a few officers present, none of whom used aggressive or abusive language. Indeed, Defendant has not suggested that the agents threatened him, detained him longer than necessary, or otherwise applied pressure in an effort to secure his consent. Nothing in this summary of events gives the Court pause; the consent was obtained in a constitutionally acceptable manner.

## CONCLUSION

Neither the custodial interrogation nor the search of Suite H suffers from any constitutional infirmity. Therefore, neither Abu Zuhrieh's statements to government agents, nor the fruits of the search of Suite H will be suppressed.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Suppression of Statement and Evidence [Doc. 23] is **DENIED.**

Dated this 21st day of July, 2015.

_____
**MARTHA VÁZQUEZ**
UNITED STATES DISTRICT JUDGE